## WESTERN DISTRICT, PITTSBURGH, 1855.

# Dalrymple *versus* Mead.

1. The Allegheny river is a highway, adapted and used for conveying lumber to market. Its eddies, pools, bars, inlets and fastening-places, belong to it, and as such, like any other public highway, are common to all.

2. No one has a right to the exclusive use of any part of the Allegheny river, further than is necessary to carry on his business in using it as a highway.

3. Any one has a right to use an eddy of the Allegheny river for the purpose of making up a raft, but not to remain longer than is necessary for that purpose, to the exclusion of others.

ERROR to the Court of Common Pleas of *Warren county.*

In the spring of 1852, plaintiff had run some pieces of lumber out of the Brokenstraw creek, a tributary of the Allegheny river, and had landed the same in the Allegheny river, near the mouth of said creek, at what is called Brokenstraw eddy. These pieces had been coupled together, for the purpose of forming a river-raft. This river-raft was nearly completed, there being but one piece back in the Brokenstraw creek, which plaintiff was endeavoring to get out, when the facts occurred out of which this suit arose. This eddy is a safe and convenient place for lumber to be coupled and prepared for running down the Allegheny river; and the water being sluggish, rafts lie there in safety during the floods, and while their owners are preparing to run them down the river. Mead had run a number of pieces down the creek to the river, and selected a place on the shore, and began to couple

his pieces. He coupled one "string," and fastened it to a tree on the shore by a cable. On the outside of this, he began to couple a second string, when Dalrymple came down the creek with his pieces, and landed them on the outside of Mead's partially-formed raft. He stretched his cable across Mead's raft, and fastened to the same tree with Mead's. In this way Dalrymple coupled all his pieces. In the meanwhile, Mead's other pieces had been temporarily fastened to other rafts, to await the departure of Dalrymple's. Mead requested Dalrymple to drop his raft, and give him a chance to couple on the rest of his pieces. Dalrymple paused a moment, and then said, "my hands have gone on, and would not like to come back now." Mead then said, "may I do it?" and Dalrymple replied, "yes, if you think you can safely." On the next morning, (being Friday,) Mead dropped Dalrymple's raft below, and fastened it with the cable to a large tree.

On Saturday night the water arose, and early on Sunday morning plaintiff's raft broke loose and went off. This suit was brought to recover damages sustained by plaintiff, by defendant's interference with his raft.

On the trial, the court were requested by the plaintiff to charge the jury as follows:

1. That the stream is a public highway, common to all. The first occupant of any particular locality has an exclusive right until he chooses to vacate.

2. The defendant had no right to interfere with plaintiff's property, and did so at his peril, if without consent. If the consent was accompanied with the condition of equal safety, it gave him no other rights than he would have had without consent.

3. If a loss occurs, which must be borne by one of two equally innocent parties, the loss falls on him whose act occasioned it.

4. If the defendant moved the raft of plaintiff for his own convenience, and not at the request of plaintiff, he was bound or liable for any consequences that resulted from that act disastrous to the plaintiff, without regard to the question of negligence.

5. If the jury believe that the plaintiff did not intend, in the permission he gave, to increase the risk of his raft, the defendant was liable for all increased risk, in consequence of said removal; and if the jury believe the loss of said raft was in consequence of the removal, the defendant is liable.

6. If in the consent that was asked and given, it was the understanding of the parties that the plaintiff's raft should be dropped to a point immediately below that of the defendant, where it would have been equally safe; and if the defendant did not employ the necessary means or force to stop the raft at that point, and it went to a place of greater insecurity, and was lost

[Dalrymple *v.* Mead.]

in consequence, the defendant is liable to make good the loss to the plaintiff.

The court were requested by defendant to charge as follows:

1. That if the jury believe that portions of Mead's raft were fastened to the shore at the place called the Plum Trees, for the purpose of coupling with other lumber of defendant, and plaintiff run and fastened his raft on the outside in such a manner that defendant could not couple his lumber, then defendant had a right to remove plaintiff's raft, using reasonable care and caution in doing so, and securing the same.

2. That if Dalrymple gave permission to Mead to drop the raft from the place where it was tied at the Plum Trees, there can be no recovery, unless in dropping or securing it below, the defendant was guilty of negligence or the want of reasonable care and caution in fastening it.

3. That if Dalrymple might have insured his raft by the exercise of ordinary care and attention to it, after the same was dropped, he cannot recover, whether defendant was or was not wanting in proper care in securing or fastening it.

The court, GALBRAITH, P., charged the jury as follows: "Both parties were engaged in rafting lumber in the Allegheny river, in the spring of 1852, and running rafts out of the Brokenstraw creek, into the eddy in the river below, coupling them and forming them into large rafts for running down the river. After the plaintiff had made up his raft, the defendant removed it a short distance down the river, and fastened it to some trees there, so as to make up his raft in the place before occupied by plaintiff. Shortly afterwards the river rose suddenly, and broke the plaintiff's raft from it fastenings, which went off down the river, and portions of it were lost. This suit is brought to recover damages against the defendant, for the injury sustained by his removing the raft of the plaintiff.

"The Allegheny river is admitted on all hands to be a great highway, peculiarly adapted and used extensively in the business of conveying lumber of all kinds to market, in the towns and cities below. Its eddies, pools, bars, inlets and fastening-places, all belong to it; as such, like any other public and common highway, it is common to all, open and free for the use of every one while using it consistently, with the same right to be enjoyed by every one else. No one has a right to the exclusive use of any part of it, further than is necessary to carry on his business in using it as a highway. At a steamboat landing or railroad depot, or other place of great resort in a large city, one often sees conveyances and carriages of all descriptions huddled together. But to one not accustomed to scenes of that description, it would seem almost impossible that they could all get disentangled without smashing half the carriages there, or killing or breaking

the bones of half the passengers who would venture into them. Yet in a short time the active highway will be seen clear and open, and no one hurt or injured. This is all effected on the principle of mutual accommodation, and each adhering to the great law of all common highways as before stated, that no one has the exclusive right of occupancy further than is reasonably necessary in the use of it as a common highway, united with another great principle of practical life, *for each one to attend to his own business.* Occasional inconveniences must necessarily be submitted to. A man has a right to use his wagon heavily loaded, and necessarily passing slowly on a narrow road, while another with a light vehicle desires to pass him at a rapid gait, and the latter must put up with the inconvenience just as long as it is reasonably necessary for the former to occupy the road; but whenever the necessity has ceased to exist, the former must yield for his accommodation. So if the heavy wagon should break down, and the light vehicle could not otherwise pass, and it remained in the way unreasonably, the owner of the light carriage would have a right to put the broken-down wagon out of the way altogether, but would have no right in doing so to do any injury to it more than was necessary to enable him to have the use of the road. These are some of the elementary principles that regulate the occupancy of all common public highways. The jury will investigate the whole of the evidence carefully, and ascertain what the facts were. It is alleged that the defendant, without any authority from the plaintiff, unnecessarily removed his raft from the place where he had rightfully fastened it, and exposed it to the rapid flood that suddenly came on afterwards; that it was taken off down the river and large portions of it entirely lost, and that what he recovered was done at great expense, time and trouble, and claims to recover damages from the defendant for the injury thus sustained. On the part of defendant, it is contended, that he first occupied the fastening-place at the Plum Trees; that it was only by his permission and accommodation that the plaintiff occupied it at all, and that he retained it no longer than was necessary to finish up and prepare his river-raft; that by plaintiff's permission he removed it out of the way and fastened it carefully at another place suitable for the occasion, and that in doing so he employed all the care and skill that the occasion required. The court are requested to charge on sundry points put by the counsel respectively, which we will answer, and leave the jury to determine the facts upon the evidence applied to the principles here stated.

"To the 1st and 2d points of the plaintiff, we give an affirmative answer, with this explanation to the 1st—instead of the words 'until he chose to vacate,' substitute 'until he has had the reasonable and necessary use of it.' To the 2d point also,

[Dalrymple *v.* Mead.]

that the defendant had no right to interfere with plaintiff's property, until he had the reasonable use of it for the purpose for which he had occupied it in making up and preparing his raft, and it became necessary for the defendant, in the exercise of the same right, to make up his raft at the same place.　The 3d point is answered in the affirmative; the 4th is also answered in the affirmative, with the same explanation as the 1st and 2d; and the 5th also.　The 6th is also answered in the affirmative, with the same explanation.

"The two first points of the defendant are answered in the affirmative.　The right solution of the 3d point depends upon the fact whether the plaintiff had the right to occupy that portion of the eddy where the-fastening was, longer than he had occupied it.　Both had a right in common to make up their rafts in that eddy.　It was a suitable place for those who owned small rafts, adapted to the Brokenstraw creek, to put their platforms together and form their rafts suitable to the river business.　No one had a right to the exclusion of another longer than was reasonably necessary for that purpose, so as to prevent, or put to great inconvenience, others from doing the same thing, in the pursuit of their lawful business.　When landed at a place of merely repairing rafts, it might not be necessary to continue a raft in one eddy or landing-place as long as at a city, where the object was not so much to prepare and put the rafts together, as to obtain purchasers and negotiate sales, and make arrangements as to the disposition of their lumber.　The jury will take into consideration all the circumstances, the object and purposes of the use of the eddy and landing or fastening-places there; whether the plaintiff or the defendant had the first occupancy; whether the plaintiff had used or occupied unreasonably, taking into consideration the object of landing there, connected with the state of the navigation at the time in the river; whether the defendant had the permission of the plaintiff to remove the raft, so as to enable him to make up his own; and, if so, whether he abused that permission, or exposed the property of the plaintiff unnecessarily to risk and loss; or whether, in securing it, he employed reasonable care, diligence and attention to it under the circumstances.　If the jury should find for the plaintiff, the value of the lumber will be the general measure of damages, together with the trouble and expense of plaintiff in pursuing the raft; and if there was wantonness or gross carelessness on the part of defendant, they might go beyond the actual loss, just as they may think right.　If the disaster was occasioned by the plaintiff's own fault, on the principles mentioned, or was the result of mutual carelessness or negligence of both, it was then an accident, and the condition of the defendant the best, and the verdict should be in his favor."

[Brooks *v.* Miller.]

The errors complained of, were the answers to plaintiff's 1st, 2d, 4th, 5th, and 6th points, and to defendant's points.

*Wetmore* and *Johnson & Brown*, for plaintiff in error, referred to Act of 21st March, 1798, 3 Smith's Laws, 320; 2 Kent's Com. 575; *Beatty* v. *Gilmore*, 4 Har. 463; *Cook* v. *Champlain Transportation Co.*, 1 Denio, 91; *New Haven Steam Boat Co.* v. *Vanderbuilt*, 16 Conn. 420; *Cadbury* v. *Nolen*, 5 Barr, 320; *Hans* v. *Palmer*, 9 Har. 296.

———, for defendant in error, referred to *Pittsburgh City* v. *Grier*, 10 H. 68; *Beatty* v. *Gilmore*, 4 Har. 466; *Forsyth* v. *Walker*, 9 Barr, 150; *Hice* v. *Kugler*, 6 Wh. 338; *Souter* v. *Bagmore*, 7 Barr, 420; *Morrison* v. *Davis*, 8 Har. 171.

The opinion of the court was delivered January 10, 1856, by

Lowrie, J.—We think that the general law of navigable rivers, relating to the rights of people passing along them with their rafts, and occupying their eddies and landings, was properly explained by the court to the jury. If there is any special custom which sanctions a different rule for the present case, it has not become known to us, and cannot be admitted as part of the case, without being proved, like other facts. None such having been proved, we can say nothing about its validity.

Judgment affirmed.